**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| T.R. and P.S., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHEAST GEORGIA HEALTH SYSTEM, INC.,<br><br>Defendant. | Case No. ____________<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs T.R. and P.S. (collectively, "Plaintiffs"), at all times relevant herein, were patients of Northeast Georgia Health System, Inc. ("NGHS" or "Defendant"), and used Defendant's Website to schedule appointments, fill out forms, request information, make payments, view services, look up doctors, review pages dedicated to symptoms and conditions, and otherwise obtain and manage healthcare services. Plaintiffs bring this class action against Defendant in their individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, their counsel's investigation, and upon information and belief as to all other matters, as follows:

1. Plaintiffs bring this class action to redress Defendant NGHS's unlawful, systematic, and ongoing practice of collecting, disclosing, and monetizing patients' most sensitive healthcare information—hereinafter "Private Information"—to Alphabet Inc., an unauthorized commercial third party, without patient knowledge, authorization, or consent. Alphabet Inc. is referred to herein as "Google."

2. As used herein, "Private Information" means and includes: (i) personally identifiable information ("PII"), such as name, email address, IP address, device identifiers, and geolocation data; (ii) communications, messages, and content transmitted through Defendant's digital properties; and (iii) protected health information ("PHI") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. Defendant accomplishes this unlawful scheme through the covert deployment of "Tracking Tools" embedded in its Website and patient-facing digital properties.

3. Defendant is a health care provider organized and existing under the laws of the State of Georgia. NGHS is a health system headquartered in Gainesville, Georgia, with multiple hospitals, facilities, clinics, and other locations providing healthcare services. Defendant owns and operates https://www.nghs.com/ as its main website (the "Website").

4. Defendant designed and actively operates its Website as a marketing and patient-facing tool to encourage its patients and prospective patients, including

Plaintiffs and Class Members, to use its Website to seek and manage healthcare services from Defendant. Specifically, Defendant offers the Website to patients and prospective patients as a confidential means of locating doctors and treatment facilities, booking appointments, communicating symptoms, searching medical conditions and treatment options, requesting medical records, completing forms, paying bills, and accessing health information.

5. Defendant is a HIPAA-covered healthcare entity, and thus its disclosure and use of Private Information for marketing is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, no health care provider can disclose a patient's PHI to a third party without express written authorization, and no health care provider can use a patient's PHI for marketing purposes without express written authorization.

6. Plaintiffs and Class Members had a reasonable expectation of privacy when utilizing the Website for healthcare services, including locating doctors, searching medical conditions and treatments, scheduling appointments, completing forms, requesting medical records, and paying bills.

7. Defendant owed its patients, including Plaintiffs and Class Members, multiple legal duties to protect the Private Information it collected and transmitted through its Website. These duties included common-law, contractual, and statutory duties to protect against the disclosure and misuse of Plaintiffs' and Class Members' confidential medical communications and health information.

8. Although Plaintiffs are presently unaware of every type of tracking tool that Defendant deployed during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third party: (1) that has not executed a HIPAA-compliant Business Associate Agreement with Defendant; (2) for which patients did not execute a HIPAA-compliant disclosure authorization; and (3) for which patients did not execute a HIPAA-compliant marketing authorization.

9. As used herein, the term "Tracking Tools" includes Google Analytics, Google Ads Conversion Tracking, Google Tag Manager, DoubleClick, and similar Google tools used for analytics, advertising, conversion tracking, or related marketing purposes.

10. The Tracking Tools' specific purpose is to provide website owners with the ability to acquire raw web-user data and transform it into a monetizable marketing commodity, just as an oil company acquires crude oil to transform it into

gasoline. The Tracking Tools are offered for "free" to companies like Defendant but require the website owner to share and disclose web users' valuable data with Google.

11. Through implementation of the Tracking Tools, Defendant deprived Plaintiffs and Class Members of their privacy rights by: (1) surreptitiously tracking and recording Plaintiffs' and Class Members' confidential communications and Private Information; (2) causing Plaintiffs' and Class Members' communications to be disclosed and intercepted by Google; (3) utilizing the Private Information for marketing purposes; (4) converting and monetizing the Private Information through various marketing tactics, which, upon information and belief, included audience building, retargeting, geolocation, and other invasive marketing tactics; (5) failing to execute a HIPAA-compliant Business Associate agreement governing the safekeeping of patient data; and (6) failing to obtain Plaintiffs' express authorization before sharing and using Plaintiffs' and Class Members' Private Information for marketing purposes.

12. HIPAA defines PHI as individually identifiable health information ("IIHI") that relates to a person's past, present, or future physical or mental health, the delivery of healthcare services, or payment for healthcare. Data is identifiable

under HIPAA if it directly identifies the individual or if there is a reasonable basis it could be used to identify the individual.[1]

13. A covered entity, like Defendant, cannot disclose a person's PHI to a third party or utilize a person's PHI for marketing purposes without express written authorization.

14. Plaintiffs' and Class Members' communications with the Website include and qualify as PHI because the data: (1) is related to their past, present, and/or future medical care as patients of Defendant; and (2) was sent in combination with persistent unique identifiers from which Plaintiffs and Class Members could reasonably be associated with the data.

15. At a minimum, the information that NGHS divulged allowed Google to learn that specific individuals were patients or prospective patients seeking or receiving healthcare from NGHS ("patient status"). Standing alone, disclosing the fact that an individual is seeking or receiving medical care is a highly offensive breach of confidentiality.

16. The Tracking Tools, however, collected and disclosed far more sensitive Private Information than just Plaintiffs' and putative Class Members' patient status. The Tracking Tools were configured and implemented to collect and

[1] 45 C.F.R. § 160.103.

disclose users' specific actions on a page, including views, clicks, searches, and form submissions, and transmitted descriptive page URLs from pages Plaintiffs and Class Members searched, viewed, and used. The sensitive pages tracked included, but were not limited to: (a) pages for finding doctors and treatment facilities; (b) pages listing medical services, including cancer services; (c) pages dedicated to symptoms, conditions, and treatments; (d) pages identifying doctors and specialties; (e) medication and medical-record pages; and (f) appointment, payment, and patient-information pages.

17. Defendant is in exclusive control of the extent to which form fields were captured and disclosed, which would have revealed additional highly sensitive Private Information.

18. In combination with the disclosure of the Private Information described above, the Tracking Tools collected and disclosed unique personal identifiers, including tracking IDs, timestamps, Google identifiers, device identifiers, and data used for browser fingerprinting. While appearing anonymous, these identifiers are persistent and unique data points from which Google can directly identify users through its records or cross-reference other data sets to connect Plaintiffs and Class Members with their specific Website activity and Private Information.

19. Google, for example, can connect patient data from Defendant's Website to an individual patient's Google Account ("cid"), which is linked to the

user's Google account and contains additional details about the user's identity. Google "stores users' logged-in identifier on non-Google websites … in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[2]

20. Moreover, the Tracking Tools' baseline configurations collect and disclose extensive additional user data that can be used to identify a specific user, including the user's IP address, type of device, operating system, and browser details (browser fingerprinting). Consequently, with the advancement of browser fingerprinting, Google can identify users regardless of persistent cookies.

21. Simply put, the data Defendant disclosed via its use of Tracking Tools on the Website is personally identifiable health information and is the digital equivalent of disclosing a comprehensive patient list to Google. Indeed, Google offers Tracking Tools free of charge, but the price that Defendant paid was the

---

[2] *See Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. Aug. 7, 2023) (denying summary judgment and citing internal evidence from Google employees).

intercepted patient data. Effectively, Defendant traded access to patient data for access to "free" marketing tools.

22. The HIPAA rule allows for a limited data set[3] of PHI to be disclosed, provided that (1) specific direct identifiers are removed from the data set and (2) the recipient enters into a Business Associate Agreement ("BAA") promising certain safeguards. Here, the identifiers were not removed, and there was no BAA signed—so the safe harbor would not apply. Moreover, it is well recognized that Google will not execute a BAA with healthcare providers related to the transmission of data from health services websites.

23. Instead of opting for a HIPAA-compliant analytics and marketing service, Defendant bartered its patients' data in exchange for free Google services that were never designed or intended for the receipt of patient data.

24. Indeed, the Office for Civil Rights at HHS issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated

---

[3] 45 C.F.R. § 164.514(e). A limited data set is protected health information that excludes the following direct identifiers of the individual or of relatives, employers, or household members of the individual: (i) Names; (ii) Postal address information, other than town or city, State and zip code; (iii) Telephone numbers; (iv) Fax numbers; (v) Electronic mail addresses: (vi) Social security numbers; (vii) Medical record numbers; (viii) Health plan beneficiary numbers; (ix)Account numbers; (x) Certificate/license numbers; (xi) Vehicle identifiers and serial numbers, including license plate numbers; (xii) Device identifiers and serial numbers; (xiii) Web Universal Resource Locators (URLs); (xiv) Internet Protocol (IP) address numbers; (xv) Biometric identifiers, including finger and voice prints; (xvi) Full face photographic images and any comparable images. 45 C.F.R. § 164.514(e)(2).

entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online Tracking Tools. The Bulletin expressly provided (in bold type) that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules." In other words, HHS expressly stated that NGHS's implementation of Tracking Tools violated HIPAA Rules.[4]

25. The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

---

[4] This guidance was vacated in part by the Federal District Court for the Northern District of Texas due to the court finding it in part to be the product of improper rulemaking and it is cited for reference only until the OCR updates its guidance, should it do so in the future. *See Am. Hosp. Ass'n v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (N.D. Tex., June 20, 2024). Notably, the court's order found only that the OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while users navigated unauthenticated public webpages ("UPWs") was improper rulemaking. The Order in no way affects or undermines the OCR's guidance regarding covered entities disclosing personal identifiers, such as Google or Facebook identifiers, to third parties while patients were making appointments for particular conditions, paying medical bills or logging into (or using) a patient portal. *See id.* at 3-4, 31, n. 8 (vacating the OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the FTC bulletin on the same topics remains untouched, as do the FTC's enforcement actions against health care providers for committing the same actions alleged herein.

26. State wiretapping laws expressly forbid Defendant's conduct. Moreover, the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, prohibits the unauthorized interception of patients' confidential communications with medical providers like Defendant.

27. Although Defendant's actions described herein violated several state and federal laws, Defendant has not taken meaningful action to modify its conduct following the release of numerous class action settlements and regulatory warnings concerning healthcare tracking technologies.

28. Defendant's Privacy Policy is hidden at the bottom of its homepage, does not prompt users to accept the policy on the Website, and does not prohibit users from browsing the Website if they do not consent to the terms.[5]

29. What's worse, Defendant's Website did not present Plaintiffs with any cookie banner, open or obvious privacy policy, or other method to obtain the user's consent not just to Defendant's use of these Tracking Tools but also to the use of their Private Information for marketing. The absence of such methods left Plaintiffs and Class Members no meaningful opportunity to understand, reject, or control the Tracking Tools before they fired and transmitted confidential and protected

[5] *Privacy Information*, NGHS, https://www.nghs.com/privacy-policy (last visited Sept. 24, 2026).

information. Under HIPAA guidelines, this practice is insufficient to gain user consent.

30. Defendant breached its common-law, contractual, and statutory duties by: (1) implementing and configuring Tracking Tools that secretly recorded and surveilled Plaintiffs' and Class Members' private medical communications with Defendant; (2) disclosing Plaintiffs' and Class Members' Private Information to Google without express written consent by each patient; (3) disclosing Plaintiffs' and Class Members' Private Medical Information to Google without a Business Associate Agreement; and (4) using Plaintiffs' and Class Members' PHI for marketing purposes without express written consent from each patient.

31. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including the invasion of their privacy, breach of the fiduciary duties owed to them, breach of the confidentiality owed to them, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information. Plaintiffs and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal damages. Plaintiffs further seek

restitution and disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to address the ongoing violations of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

32. Plaintiffs seek to remedy these harms and bring causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1); (3) violation of O.C.G.A. § 16-11-62, Eavesdropping, Surveillance, or Intercepting Communication Which Invades Privacy of Another; Divulging Private Message; (4) breach of implied contract; (5) unjust enrichment; (6) negligence; (7) violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370, *et seq.*; (8) violation of O.C.G.A. § 16-9-93(c), Forgery and Fraudulent Practices; Computer Systems Protection; Computer Crimes; and (9) invasion of privacy.

## PARTIES

33. Plaintiff T.R. is a natural person and resident of Lavonia, Georgia, where she intends to remain. At all times relevant herein, T.R. was a patient of Defendant who used Defendant's Website in connection with healthcare services.

34. Plaintiff P.S. is a natural person and resident of Buford, Georgia, where she intends to remain. At all times relevant herein, P.S. was a patient of Defendant who used Defendant's Website in connection with healthcare services.

35. Defendant Northeast Georgia Health System, Inc. is a corporation organized and existing under the laws of the State of Georgia with its headquarters and principal place of business at 743 Spring St NE, Gainesville, Georgia 30501.

36. NGHS is a health care provider organized and existing under the laws of the State of Georgia. NGHS is a health system headquartered at 743 Spring St NE, Gainesville, Georgia 30501, with multiple hospitals, facilities, clinics, and other locations providing healthcare services throughout Georgia. NGHS provides patients with access to doctors, treatment facilities, medical services, medical records, and related healthcare resources.[6]

37. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Parts 160, 162, and 164 (HIPAA)).

## **JURISDICTION AND VENUE**

38. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (i) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (ii) the

[6] *See About Northeast Georgia Health System*, NGHS, https://www.nghs.com/about (last visited Oct. 21, 2026)

proposed Class consists of more than 100 members; and (iii) at least one member of the proposed Class is a citizen of a state different from Defendant.[7]

39. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action asserts claims arising under the laws of the United States, including the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*

40. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located within this District, and because Defendant has systematic and continuous contacts with this District sufficient to render it at home in this forum.

41. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendant's principal place of business is located in this District.

[7] Although Northeast Georgia Health System's facilities are concentrated in Georgia, its operations extend throughout northeast Georgia, including facilities in Demorest and Dahlonega near the North Carolina and South Carolina borders. Given the geographic reach of these operations, Plaintiff alleges on information and belief that members of the proposed Class include individuals domiciled in, and citizens of, North Carolina and South Carolina, thereby satisfying CAFA's minimal-diversity requirement. The identities and domiciles of these Class members can be further substantiated through discovery of Defendant's patient-registration, billing, and payment records.

## COMMON FACTUAL ALLEGATIONS

### A. Duty of Confidentiality

42. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

43. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

44. The AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including, … personal data (informational privacy) . . . .[8]

45. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of a patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. ***Disclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship***. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified; [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized

[8] AMA Code of Medical Ethics, *Opinion 3.1.1: Privacy in Health Care*, https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care (last visited Oct. 21, 2026)

> surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted.[9]

46. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. ***Physicians who collect or store patient information electronically … must: … [r]elease patient information only in keeping with ethics guidance for confidentiality and privacy.***[10]

### B. Expectation of Privacy

47. At all times when Plaintiffs and Class Members provided their Private Information to Defendant, their trusted healthcare provider, they each had a reasonable expectation that the information would remain private and that Defendant would not share their Private Information with third parties for a commercial purpose unrelated to patient care.

48. Plaintiffs and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them,

---

[9] AMA Code of Medical Ethics, *Opinion 3.2.4: Access to Medical Records by Data Collection Companies*, https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies (last visited Oct. 21, 2026).

[10] AMA Code of Medical Ethics, *Opinion 3.3.2: Confidentiality & Electronic Medical Records*, https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records (last visited Oct. 21, 2026).

had they known that Defendant would disclose their Private Information to third parties.

49. A patient's web activity and Private Information includes page views of medical information, page views of specific physicians, form completions requesting a medical appointment, clicks on log in buttons for access to a patient portal, and form completions paying a medical bill, all of which relate to the past, present, and future medical care of that individual. Moreover, that web activity when combined with unique identifiers that can connect the web activity with a specific person is PHI under HIPAA.

50. Defendant deprived Plaintiffs and Class Members of their privacy rights when it intentionally, and/or recklessly, and/or negligently: (1) implemented and configured several Tracking Tools on its Website that surreptitiously tracked, surveilled, and recorded Plaintiffs' and Class Members' PHI; (2) disclosed Plaintiffs' and other Class Members' PHI to Google; (3) utilized Plaintiffs' and Class Members' PHI for marketing purposes; and (4) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

51. By installing and implementing Google Tracking Technology, Defendant intentionally and proximately caused Plaintiffs' and Class Members' PHI to be intercepted by and/or disclosed to Google.

**C. Underlying Web Technology, Tracking Tools & Communications**

52. To understand Defendant's unlawful data-sharing practices, it is important to understand some basics of computer science and online communications.

53. Devices (computers, laptops, tablets, and smartphones) access web content through internet browsers (e.g., Google Chrome, Mozilla Firefox, Apple Safari, and Microsoft Edge).

54. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

55. Every website is comprised of markup and source code. Markup is the forward-facing portion of the website that the visitor sees and interacts with, such as images, links, forms, and more. By contrast, source code is essentially the invisible back-end portion of the website. The website user does not see what is happening within the source code during an ordinary website visit, but the source code acts as the set of instructions that commands the website visitor's browser and causes it to take certain actions when the web page first loads or when a specified event triggers the code. The source code is the mechanism that controls how a website user's browser communicates with the website's server, and vice versa.

56. As a user interacts with a website, multiple forms of web communications are occurring in the background between the user's browser and the website's server and include, but are not limited to:

- **HTTP Requests** are electronic communications sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests (e.g., request to access a page). POST Requests are requests to send data to the server (e.g., Form Submissions);

- **POST Requests** are the standard method by which a website transmits the information a user types into an online form — such as a name, email address, or message — from the user's browser to the website's server, distinguishing it from methods that display such data openly in the page's web address.

- **HTTP Responses** are electronic communications sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data;[11]

- **Uniform Resource Locators** ("URL") which are web addresses that contain details of the HTTP Request and the user's specific search and browsing activities; and,

- **Cookies** which are small text files that are set by the website the user is visiting and establish lines of communication between the user's browser and the website server. First Party Cookies are used to store information on the client device which can later be communicated to a server or servers such as user preferences (e.g., remember log in info). Users cannot detect or prevent transmissions through first-party cookies. Third-Party Cookies are set by a third-party domain such as Google and

---

[11] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

are used for targeted marketing purposes. Third-Party cookies can track the user across the web as the user searches and visits other websites.

57. A website owner, if motivated, can manipulate the HTTP Request process and allow third parties access to the user-server web communication. This interference is typically done through tracking technology with the intent to gather data from the user's website behavior for monetization and various marketing purposes.

58. Tracking technology, like the Tracking Tools, is implemented on a website by secretly embedding and configuring software into a website's source code. Once the Tracking Tools are implemented and configured in the source code, they automatically intervene in and manipulate HTTP web communications between the user's browser and the website server, and they instruct the website to send a duplicate transmission of the communication to an unauthorized third-party server, Google.

59. Here, without its patients' consent, Defendant effectively used its Website's source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google, to listen in on their communications with Defendant and thereby intercept those communications, including PHI.

## D. Defendant Collected & Disclosed Plaintiffs' and Class Members' Private Information to Google Through the Use of Google Tracking Tools.

60. Google offers Tracking Tools to entities like Defendant for "free." However, access to the Google tools is bartered in exchange for Defendant's patients' PHI. By implementing and configuring Google Analytics tracking IDs, Google Ads Conversion Tracking IDs, Google Tag Manager, and DoubleClick, Defendant caused Plaintiffs' and Class Members' communications to be intercepted by and/or disclosed to Google.

### *1. The Google Tracking Tools Suite*

61. Defendant's source code implemented with Google Analytics, Google Tag Manager, and Google Ads Conversion Tracking manipulated patients' browsers by secretly instructing them to duplicate patients' communications (HTTP Requests) with Defendant and to send those communications to Google.

62. Google Analytics and Google Ads perform complementary functions: Google Analytics records the exact page and title, while Google Ads sends conversion-tracking requests marking the user as a potential patient. These transmissions occurred contemporaneously, invisibly, and without the patient's knowledge.

63. Several different methods allow marketers and third parties to identify individual website users, but the examples below demonstrate what happens when a

website user is logged into a Google account on a web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with Google's Tracking Tools. For example, the Tracking Tools transmit the user's CID and other identifiers, allowing Google to link the user's online communications and interactions to the user's Google Account.

64. Google receives at least five cookies when Defendant's Website transmits information.

| Name | Value | Domain |
| --- | --- | --- |
| __Secure-3PAPI... | rC7qMe3px... | .google.com |
| __Secure-3PSID | g.a000CglY... | .google.com |
| __Secure-3PSID... | AKEyXzVC... | .google.com |
| __Secure-3PSID... | sidts-CjlBkl... | .google.com |
| NID | CqQDCAES... | .google.com |

*Figure 1. Screenshot from Defendant's network traffic report for Google Analytics list of cookies sent out.*

65. The NID cookie, pictured above, contains an encrypted Google Account ID and browser identifier. Google, at a minimum, uses the NID cookie to identify users, and this particular cookie can stay on a user's website browser for up to six months to identify the user's history on the Website.

66. The cookies listed in the image above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Google. Although Google created these cookies, Defendant is ultimately responsible for the manner in which

individual Website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of Google Tracking Tools throughout its Website.

67. Defendant also revealed its Website visitors' identities via first party cookies such as the _ga cookie that Google uses to identify a particular browser and a user:

| | | |
|---|---|---|
| _ga | GA1.1.1495105333.1790278023 | .nghs.com |

*Figure 2. Screengrab from Defendant's network traffic report depicting the first party cookie _ga.*

68. Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID cookies and CID cookie, the _ga cookie functions as a first-party cookie—*i.e.*, a cookie that was created and placed on the Website by Defendant.

***2. The DoubleClick Tracking Tools***

69. Defendant also installed Google DoubleClick on the Website. Through DoubleClick's tracking technologies, Google identifies an individual through their web behavior in order to improve customers' advertising campaigns.

70. Like Google Analytics, a website owner like Defendant installs DoubleClick by adding a small piece of JavaScript code to each page of a Website.

This code immediately intercepts a user's page views, clicks, form submissions, video plays, and other custom-defined actions. The code also collects information on specific individuals and their device information.

71. DoubleClick distinguishes itself from Google Analytics in that it specifically focuses on advertising functionality. Google collects, packages, processes, and stores data for ad retargeting, which allows Defendant to target advertisements based on a user's interactions with Defendant's Website.

72. The DoubleClick Tracking Tools include the IDE and, upon information and belief, the DSID cookies. The IDE cookie is a persistent advertising identifier that records user actions and measures ad effectiveness. The IDE identifier can be associated with a user's browser or device over extended periods of time. Meanwhile, the DSID cookie links to a user's Google account when they are logged into Google. The cookie links browsing activity on non-Google websites to the user's Google account and ensures that the user's ad personalization settings are respected across non-Google sites. The cookies contain unique user identifiers that enable Google to connect user behavior across different websites, devices, and browsing sessions.

73. The DoubleClick tracker also collects and stores IP addresses in server logs. Internet service providers assign IP addresses to networking devices such as modems or routers, to which users connect for Internet access. "IP lookup" services

map IP addresses to the country, city, county, approximate coordinates, or even the Internet service provider associated with the address. When advertising trackers like DoubleClick collect IP addresses, advertisers can target ads to users based on the IP address's geographic area. As individuals access the Internet from different locations, Google can build detailed profiles of individuals from their locations, movement patterns, and individual behaviors. Armed with an arsenal of granular location and behavioral data, Google can identify specific individuals with remarkable precision.

74. Because Defendant installed the DoubleClick tracking technology, Google's Tracking Tools would have directed patients' browsers to transmit their Private Information and any personal identifiers, such as persistent IDs or IP addresses. In this way, Google would have received PHI alongside personally identifiable information.

75. Because Tracking Tools transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Google even when they have disabled third-party cookies within their web browsers.

### *3. Google's Other Means of Identification*

76. Google also can identify consumers by their "browser fingerprint." As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what

fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[12] Browser-fingerprints can identify individual users when a computing device's IP address is hidden or when cookies are blocked.

77. In 2017, researchers found a fingerprinting technique that could successfully identify up to 99.24 percent of all users.[13] Fingerprinting is a remarkably effective device identifier.

78. Advertisers (and trackers who want to monetize aggregated data) can utilize fingerprinting to surreptitiously track website users, just like cookies do.[14] Users cannot clear their fingerprints and therefore cannot control whether and how their personal information is collected.

79. Browser-fingerprints are personal identifiers. Google Analytics and other Google Tracking Tools can collect browser-fingerprints from website visitors.

80. Without discovery and full disclosure of the complete source code, Plaintiffs cannot identify all browser fingerprint data at issue. However, review of the publicly available code shows full browser/OS fingerprints, and screen/viewport

---

[12] Justin Schuh, *Building a More Private Web*, GOOGLE (Aug. 22, 2019), https://blog.google/products/chrome/building-a-more-private-web/.

[13] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017), https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

[14] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY (Apr. 11, 2024), https://www.pixelprivacy.com/resources/browser-fingerprinting.

sizes. Upon information and belief, additional data points were likely transmitted allowing for more accurate and identifiable browser fingerprinting.

81. Each of Plaintiffs' and Class Members' web communications are PHI because their tracked page views, clicks, and events each (1) related to the medical care of Plaintiffs and Class Members, (2) indicated that the user (Plaintiffs and Class Members) was a patient, and (3) were attributable to Plaintiffs and Class Members through any of the above identifying methods.

82. Each of these web communications were disclosed without Plaintiffs' or Class Members' express written consent and without a HIPAA-compliant Business Associate Agreement governing the transfer of data between Defendant and Google or any downstream parties.

83. In sum, Google at least utilizes the NID, _ga, CID, and DoubleClick cookies to link Website visitors' communications and online activity to their individual Google Accounts. It is likely that Google did this across individuals' entire Internet browsing.

84. Plaintiffs and Class Members used Defendant's Website and provided their PHI on webpages that contained the Tracking Tools. Upon information and belief, Google leveraged user data, which contained Private Information, to fuel its advertising effort.

## E. Users' Journey Through the Website

160. The following paragraphs walk through what Plaintiffs and Class Members experience when utilizing the Website, as well as what happens secretly in the source code and network traffic of the Website while Google Tracking Tools surveil and transmit user activity.

### *1. NGHS Homepage*

161. As patients entered the NGHS homepage of the site, they entered a secretive digital world that was surveilling each movement and each decision they made on the Website, as reflected in the image below.




*Figure 3. Screenshot of network traffic taken from Defendant's website which shows that the Tracking Tools are actively installed and firing on Defendant's Homepage.*

162. As depicted in Figure 3, immediately upon entering the homepage, Tracking Tools are firing to capture, *inter alia*, the user's visit and page views, so Defendant, Google, and any other third party tracking technologies can reissue targeted advertisements to that particular user.

### 2. *Request Medical Records Page*

163. As a user navigates the Website, they can access the NGHS Request Medical Records page.




*Figure 4. Screenshot of user's website usage. The left side shows Defendant's website for the Medical Records page. The right side shows the Request URL that was sent to Google showing the page.*



Headers Payload Preview Response Initiator

Query string parameters View source View URL-enc

| | |
|---|---|
| v | 2 |
| tid | G-G9CG05899L |
| gtm | 45je6ak0h2v881949927za20ozb77321067z 1067xf1 |
| _p | 1792588752188 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| _eu | AAAAAGQC |
| cid | 1795310461.1792588126 |
| frm | 0 |

*Figure 5. Screenshot of parsed parameters from user's transmitted data on the Request Medical Records page. The "tid" tracker ID and "cid" user ID cookie parameters are highlighted for visibility.*



| | |
|---|---|
| tag_exp | 115938465~115938469~118897920~118897930~120213116~ 120385423~120469145~120469153~121246026~121246034 |
| sid | 1792588126 |
| sct | 1 |
| seg | 1 |
| dl | https://www.nghs.com/medical-records |
| dr | https://www.nghs.com/ |
| dt | Request Medical Records - Northeast Georgia Health System |
| en | page_view |
| ep.content_group | Other group |
| tfd | 5353 |

Activate Windows
Go to Settings to activate Windows.

*Figure 6. Screenshot of parsed parameters from user's transmitted URL. The parameters that communicate the user's webpage to Google are highlighted.*

164. Figures 5 and 6 above depict the parsed data transmitted to Google via Google Analytics. The "tid" parameter is the Google tracker ID. The "cid" parameter is the individual user's persistent cookie ID assigned by Google, which remains

constant through the user's navigation of the Website. That identifier allows Google to connect the user's journey throughout the Website to the individual.

165. As shown in the above figures, the Tracking Tools communicated that the individual is requesting their health care records from Defendant's Website. That information is PHI.

166. Landing on the Request Medical Records page sends an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTTP Response, which loads the Markup for that particular webpage. The user only sees the markup, not Defendant's source code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Google is now informed that the user was Defendant's patient, who is requesting medical records.

167. Evaluation of network traffic revealed the presence of Google Analytics, the Google Tag Manager, and DoubleClick Tracking Tools, and the associated first and third party cookies, on the Request Medical Records page, which all connect an individual user to their web navigation.

### *3. Pay My Bill Page*

168. From the homepage, a patient can access the "Pay My Bill" page by utilizing a drop-down menu titled "Patients & Visitors." Upon navigating to the Pay My Bill page, the user can select one of three payment methods.

169. Landing on the Pay My Bill page sends an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTTP Response, which loads the Markup for that particular webpage. The user only sees the markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website.




*Figure 7. Screenshot of user's website usage. The left side shows Defendant's website for the Pay My Bill page. The right side shows the Request URL that was sent to Google showing the page.*




*Figure 8. Screenshot of parsed parameters from user's transmitted data on the Pay My Bill page. The "tid" tracker ID and "cid" user ID cookie parameters are highlighted for visibility.*




*Figure 9. Screenshot of parsed parameters from user's transmitted URL. The parameters that communicate the user's webpage to Google are highlighted.*

170. Figures 8 and 9 above depict the parsed data transmitted to Google via the Google Analytics Tracking Tools. Google is now informed that an individual patient is going to pay their bill after receiving health care. That information is PHI.

171. The Google Analytics tracker on the Pay My Bill page even tracks which of the three payment options the individual user selected. As depicted in Figure 10 below, this user selected the "Pay through MyChart" option.

| | |
|---|---|
| dl | https://www.nghs.com/pay-my-bill |
| dr | https://www.nghs.com/insurance-and-payment |
| dt | Easily Pay Your Bill Online - Northeast Georgia Health Syste m |
| en | accordion_expand |
| ep.content_group | Other group |
| ep.click_text | Pay through MyChart |
| ep.page_url | https://www.nghs.com/pay-my-bill |

Activate Windows

*Figure 10. Screenshot of parsed parameters from user's transmitted data. This cookie tracked that the user selected to pay their bill through MyChart.*

172. Evaluation of network traffic revealed the presence of Google Analytics, the Google Tag Manager, and DoubleClick Tracking Tools, and the associated first and third party cookies, on the Pay My Bill page, which all connect an individual user to their web navigation.

### *4. Cancer Care Page*

173. Defendant's Website provides many detailed and resourceful pages for patients to review health conditions. For example, the user can review a page about

cancer care. Upon clicking the Cancer Services page, listed in the drop-down menu under "Services," the user's browser automatically sends cookies to Google.




*Figure 11. Screenshot from user's network traffic on the Cancer Services page. The left side page is showing the Cancer Services page, and the right side of the page is showing the Google cookie requests that are triggered when the user visits this page.*

174. Landing on the Cancer Care page sends an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTTP Response, which loads the Markup for that particular webpage. The user only sees the markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website.




*Figure 12. The left side is a screenshot from Defendant's website wherein the patient has clicked Cancer Services from the Services drop down menu. The right side shows the network traffic taken from Defendant's website, which shows the live transmission of the patient's communications to Google listing prior locations that the user clicked, and tagging Google Ad Services.*



*Figure 13. Screenshot of parsed parameters from user's transmitted data on the Cancer Services page. The "tid" tracker ID and "cid" user ID parameters are highlighted for visibility*

| | |
|---|---|
| tag_exp | 115938465~115938469~118897920~118897930~120213116~120385423~120469145~120469153~121246026~121246034 |
| sid | 1792594639 |
| sct | 2 |
| seg | 1 |
| dl | https://www.nghs.com/cancer |
| dr | https://www.nghs.com/our-locations |
| dt | Cancer Services - Northeast Georgia Health System |
| en | page_view |
| ep.content_group | Other group |
| tfd | 6921 |

Activate Windows
Go to Settings to activate Windows.

*Figure 14. Screenshot of parsed parameters from user's transmitted URL. The parameters that communicate the user's webpage to Google are highlighted.*

175. Figures 13 and 14 above depict the parsed data transmitted to Google via the Google Analytics Tracking Tools. Google is now informed that the patient, identifiable through the cookie's CID parameter, is considering cancer treatment. Therefore, Google becomes aware of what treatments the user may have had or is researching.

176. Thus, without alerting the user, Defendant's Tracking Tools collected and sent the web communications the user made via the webpage to Google, and the images above confirm that the communications contain the user's Private Information.

177. Evaluation of network traffic revealed the presence of Google Analytics, the Google Tag Manager, and DoubleClick Tracking Tools, and the associated first and third party cookies, on the Cancer Care page, which all connect an individual user to their web navigation.

178. At a minimum, the above transmissions signal to NGHS and Google that the user is a patient or prospective patient. That information is undoubtedly PHI. As thousands of users communicate information about their healthcare on Defendant's Website, the Tracking Tools provide Google with the ability to link patient data to Google's organization and monetization systems. Google then granted Defendant access to sophisticated data analytics reports for website optimization, profile building, and advertising campaign optimization.

**F. The Disclosure of Private Health Information to Google Violated HIPAA Regulations.**

179. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

180. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d to 1320d-9 ("Part C"): "(1) uses

or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

181. The U.S. Office of Legal Counsel considers a defendant to have "knowingly" violated HIPAA when the defendant broadly had "knowledge of the facts that constitute an offense."[15] The defendant does not need to specifically know that its acts violated HIPAA.

182. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[16]

---

[15] *See Scope of Criminal Enforcement Under 42 U.S.C. § 1320D-6*, 29 U.S. OP. OFF. LEGAL COUNSEL 76 (June 1, 2005), 2005 WL 2488049, at *7.

[16] *The HIPAA Privacy Rule*, HHS.GOV (last visited Aug. 10, 2026), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

183. The Privacy Rule broadly defines “protected health information” (“PHI”) as “individually identifiable health information” (“IIHI”) that is “transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium.” 45 C.F.R. § 160.103.

184. IIHI is defined as “a subset of health information, including demographic information collected from an individual” that: (1) “[i]s created or received by a health care provider, health plan, employer, or health care clearinghouse”; (2) “[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual”; and (3) either (a) “identifies the individual” or (b) “[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual.” 45 C.F.R. § 160.103.

185. Under the HIPAA de-identification rule, in order to adequately de-identify a data set relating to healthcare services, “health information is not individually identifiable only if”: (1) an expert “determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information” and “documents the methods and results of the analysis

that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

a. Names;

***

H. Medical record numbers;

***

J. Account numbers;

***

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. The Google tag provides real-time conversion data to Google's "Smart Bidding" algorithms. To place an ad on a website, advertisers like Defendant might bid on ad spaces. Smart Bidding uses data to optimize ad delivery in an ad auction. Google's systems use the data provided from the Google tag to learn and predict which users are more likely to engage in business, or in the case of Defendant, request an appointment. The Smart Bidding algorithms will then automatically bid on the advertiser's behalf, placing higher bids on ads shown to prospective patients in order to maximize the return on Defendant's ad spend.[17] The powerful

[17] *See About Smart Bidding*, *supra* n.20.

Google algorithm that has been gathering data from Google's ecosystem incorporates Private Information from the Website. Defendant leverages this ecosystem to improve its chance of recruiting a new patient. Through this advertising scheme, Defendant's per-patient conversion cost is expected to be far lower than if Defendant used less sophisticated forms of advertising.

R. Any other unique identifying number, characteristic, or code…;and" The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514(b)(2).

186. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that

> the individual was treated at a certain clinic, then this information would be PHI.[18]

187. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, *the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing*. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[19]

188. Here, Defendant effectively traded its patient list for access to these valuable marketing tools. And neither Plaintiffs nor any Class Member provided express written consent for the use of their PHI for marketing purposes.

189. While there was not a direct sale of the patient list, by disclosing the patient status of all the users of the Website in exchange for valuable marketing tools,

---

[18] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance With the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS (Nov. 26, 2012), available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[19] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Aug. 10, 2026).

Defendant engaged in a bartered commercial transaction whereby its patient list was constructively and effectively sold to the world's largest marketing companies.

190. The Tracking Tools allow advertisers to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

191. Defendant utilized the Tracking Tools on numerous sensitive pages of its Website with the intent to share and disclose Plaintiffs' and Class Members' confidential web communications and behavioral data with Google.

192. Whether intentional, reckless, or negligent, the data shared with Google was PHI.

193. Upon information and belief, Defendant utilized the Tracking Tools and shared PHI with Google with the intent to maximize its marketing return on investment.

**G. Google Ads and Marketing Platform**

194. The Google Tracking Tools on Defendant's Website connect a Website visitor's browsing activity directly to the powerful Google advertising ecosystem of Google Search, YouTube, Gmail, the Google Display Network, and the Google Shopping tab. The tools integrate users' collected data into advertising campaigns run through Google Ads, Google Analytics, and the broader Google Marketing

Platform.[20] Google's interconnectedness of user data allows Google to connect browsing data, which in this case reveals Private Information, to individual users, including Plaintiffs and Class Members.

195. After intercepting and collecting the Private Information, Google processes the data and associates it with the visitor's real-world identity through the "Google Signals" feature when the user remains signed into a Google Account and does not disable Ads Personalization (which is "on" by default). Google Signals links website session data to a user's Google Account, which generally tracks across devices and can contain user information like name, email address, phone number, location history, YouTube activity, and search history.[21]

196. Because a user's Google Account uniquely identifies an individual across every device on which they are signed in, Google can easily use that identity to build a unified, cross-device profile of the Website visitor's behavior, including their visits to Defendant's Website.

197. In addition to Website analytics, the Google tag creates value for Defendant by providing Defendant with access to sophisticated algorithms and

---

[20] *About Customer Match*, GOOGLE ADS HELP, https://support.google.com/google-ads/answer/6379332 (last visited Sept. 23, 2026).

[21] *Activate Google Signals for Google Analytics Properties*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9445345 (last visited Sept. 23, 2026).

machine learning tools, run through Google Ads and Google Ads Data Manager, that allow Defendant to further utilize Plaintiffs' and Class Members' behavioral data from the Website to build highly targeted audiences. These audiences include both remarketing lists built through Customer Match and lookalike audiences built through Google's audience-expansion tools.[22]

198. "Customer Match" and Google Ads remarketing lists are used to re-target users who have previously visited a website or taken specific actions on the website.[23] For example, if a user visited Defendant's Website and did not request an appointment, a remarketing audience could be built from the data gathered by the Google tag to retarget that user with specific ads across Search, YouTube, Gmail, or the Display Network to try to get them to come back to the Website to schedule an appointment.

199. In addition, Google designs a "lookalike" audience with the goal of reaching new potential patients who share similar characteristics, behaviors, and demographics as the existing high-value patients tracked by the Google tag.[24] In this case, if Defendant wanted to target prospective patients for specialized treatment, it

---

[22] *See About Customer Match*, *supra* n.18; *see also About Smart Bidding,* GOOGLE ADS HELP, https://support.google.com/google-ads/answer/7065882 (last visited Sept. 23, 2026).

[23] *See About Customer Match*, *supra* n.18.

[24] *Use Lookalike Segments to Grow Your Audience,* GOOGLE ADS HELP, https://support.google.com/google-ads/answer/13541369 (last visited Sept. 24, 2026).

could feed patient data from the Website to Google Ads as a "seed list," which Google would use to identify and target individuals with similar profiles to Defendant's current patients. Google can leverage its entire advertising ecosystem. Google's newer "suggestion mode" allows its algorithms to reach qualified prospects beyond the seed list's defined similarity range.

200. The Google tag provides real-time conversion data to Google's "Smart Bidding" algorithms. To place an ad on a website, advertisers like Defendant might bid on ad spaces. Smart Bidding uses data to optimize ad delivery in an ad auction. Google's systems use the data provided from the Google tag to learn and predict which users are more likely to engage in business, or in the case Defendant, request an appointment. The Smart Bidding algorithms will then automatically bid on the advertiser's behalf, placing higher bids on ads shown to prospective patients in order to maximize the return on Defendant's ad spend.[25] The powerful Google algorithm that has been gathering data from Google's ecosystem incorporates Private Information from the Website. Defendant leverages this ecosystem to improve its chance of recruiting a new patient. Through this advertising scheme, Defendant's per-patient conversion cost is expected to be far lower than if Defendant used less sophisticated forms of advertising.

---

[25] *See About Smart Bidding*, *supra* n.20.

201. Defendant exclusively controls whether Google's "Enhanced Conversions"[26] feature—which allows a website to send Google additional first-party visitor data, such as hashed email addresses and phone numbers, to improve conversion matching—is implemented. The availability of such a feature shows that Defendant had notice of privacy concerns in using the Google tag. Moreover, while Defendant exclusively controls, builds, and utilizes any of its audience marketing campaigns, the presence of targeted advertisements indicates that Defendant was utilizing Google Ads's audience-building tools to create audiences and monetize Plaintiffs' and Class Members' browsing activity from the Website.

202. At the bare minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiffs' and Class Members' patient status.

### H. Defendant's Marketing Practices Violated HIPAA Standards

203. While Plaintiffs do not assert a private right of action under HIPAA, the intentional violations of the statutory duties and standards under HIPAA constitute criminal and civil acts subject to penalties imposed by 42 U.S.C. § 1320d-6. Here, Defendant knowingly implemented Tracking Tools with the intent of collecting and disclosing individually identifiable health information relating to an

---

[26] *About Enhanced Conversions,* GOOGLE ADS HELP, https://support.google.com/google-ads/answer/9888656 (last visited Sept. 24, 2026).

individual, as those terms are defined under HIPAA. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b).

204. The primary motivation and a determining factor in Defendant's collection, interception, and disclosure of Plaintiffs' and Class Members' Private Information was the use of patient data for advertising in the absence of express written consent. Such conduct gives rise to a violation of HIPAA.

205. Moreover, there is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320d-6(b)(3).

**I. Defendant Was Enriched and Benefitted from the Use of the Tracking Tools and Unauthorized Disclosures to Google.**

206. Defendant's further use of Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

207. In exchange for disclosing Private Information of its patients, Defendant was enriched and enhanced by advertising services and more cost-efficient marketing on its platform.

208. Upon information and belief, Defendant utilized Plaintiffs' and Class Members' data that was collected through Google marketing tools to implement one or more of the following marketing tactics: website optimization, audience building, and targeted campaigns, all designed to target current and potential patients to drive more profit. Defendant directly benefited through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

209. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and state law.

### J. Plaintiffs' and Class Members' Private Information Had Financial Value

210. Plaintiffs' data and Private Information have economic value in established marketplaces. Google regularly uses data that it acquires to create custom audiences and has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

211. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil."[27]

---

[27] *See, e.g.*, Vahid, *Data Is the New Oil: A Powerful Metaphor with a Catch*, MEDIUM (May 23, 2026), https://medium.com/@vhid/data-is-the-new-oil-a-powerful-metaphor-with-a-catch-35899859bcb6 (last visited Aug. 11, 2026).

Conservative estimates suggest that in 2018, internet companies earned $202 per American user from mining and selling data. That figure is only expected to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.[28]

212. The value of health data, including patient lists in particular, is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[29]

213. Moreover, healthcare systems commonly value the lifetime value of a patient and the value of a marketing lead and impression, as well as the value of the conversion of a new patient.

214. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole

---

[28] *See* Robert J. Shapiro, *What Your Data Is Really Worth to Facebook*, WASHINGTON MONTHLY (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/.

[29] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME.COM (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited June 30, 2026).

market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[30]

215. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[31]

216. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

---

[30]*See* Christina Farr, *Hospital Execs Say They Are Getting Flooded With Requests For Your health Data,* CNBC, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited July, 20, 2026).

[31] VERO, *How to Collect Emails Addresses on Twitter* https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited June 30, 2026).

217. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

218. Additionally, health care data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[32]

219. Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[33]

220. Data brokers combine online and offline data to market to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions. Some data brokers have been found to store data indefinitely posing significant privacy risks.[34]

221. Data brokers do not obtain the data directly from consumers. Rather, they obtain it through various sources including partnerships with third party

---

[32] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[33] *FTC Recommends Congress Require the Data Broker Industry to be More Transparent and Give Consumers Greater Control Over Their Personal Information*, FTC (May 27, 2014), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater.

[34] *Id.*

marketers that utilize tracking tools. While each data broker source may provide only a few data elements about a consumer's activities a data broker can combine the data sets to form a more detailed profile of the consumer's life.

222. In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem. The web trackers serve as pivotal components in the data broker ecosystem by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics.[35]

223. The U.S. data broker market is projected to grow from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on the website.

224. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by mail, research medications online, or respond to pharmaceutical ads or other treatment advertisements. These predictive models are then sold and used for targeted advertising.

---

[35] ONLINE DATA PRIVACY REPORT: WEBSITE PRIVACY AND COMPLIANCE CHALLENGES (Mar. 2024), https://lokker.com/api/directus-assets/419fdf43-83ba-4dba-9821-d8eff94f956a (last visited July 21, 2026)

225. The lack of transparency in the data brokering ecosystem makes it unknown whether Google sold or traded any of the data it received through the Tracking Tools at issue.

226. However, it is indisputable that the data at issue, given its medical nature, is highly valuable for segmentation and profile building.

227. Once the data is shared and disclosed to Google, the patients, Class Members, and Defendant lose control over its usage and distribution.

**K. Plaintiffs and Class Members' Common Experience**

228. Plaintiffs and Class Members are Defendant's patients who received healthcare services from Defendant. As part of the medical services, Plaintiffs and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions. At all times, while using the Website, Plaintiffs and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

229. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

230. Plaintiffs and Class Members were not aware that their Private Information would be disclosed to Google and that Defendant was utilizing their

Private Information for marketing purposes because Defendant did not acquire their consent.

231. During the relevant time period, Plaintiffs had Google accounts.

232. As Plaintiffs and Class Members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions back to the Plaintiffs' and Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiffs' and Class Members' Private Information to Google.

233. Accordingly, during the same transmissions, the Website routinely provided Google with digital identifiers, allowing Google to connect the Plaintiffs and Class Members with their Private Information.

234. Furthermore, following the disclosure, Plaintiffs' and Class Members' Private Information was aggregated and analyzed through the Google analytics tools and reports. From there, the aggregated data could be segmented and linked to specific user profiles for use in building "custom" and "lookalike audiences" and was incorporated into Google algorithms for other avenues of re-targeting.

235. Once released to the digital marketing ecosystem, the collected data may have also been shared or combined with data broker aggregated data and profiles for additional marketing reach.

236. Upon information and belief, Defendant monetized Plaintiffs and Class Members Private Information by utilizing Google's tools to save substantial marketing costs while decreasing cost per conversion and increasing overall patient conversion.

237. Without discovery, Plaintiffs and Class Members are unable to know the full extent of the improper disclosure and use of their Private Information.

**L. Plaintiffs' Experiences**

***Plaintiff T.R.'s Experience***

238. Plaintiff T.R. is a patient of Defendant and last used the Website in September 2026. She first used the Website more than five years ago and has used it consistently through the years.

239. She used the Website for the purpose of scheduling appointments, filling out forms, requesting information, making payments, and viewing services such as looking up particular doctors and reviewing pages dedicated to symptoms.

240. Plaintiff T.R. entered personal and health-related information into the Website.

241. During all relevant times, Plaintiff T.R. has also had a Google account which she was logged into on her personal devices and believes that the Private Information she communicated via the Website was also transmitted to Google via

Defendant's use of Google Analytics on the Website. Plaintiff T.R. used those same devices to access Defendant's Website.

242. After viewing the Website, Plaintiff T.R. noticed advertisements about the company or related services consistent with the use of her Website activity for targeted marketing.

243. Upon information and belief, the Private Information that Google received from Defendant included specific facts concerning her medical condition and treatments was personally identifiable (linked to Plaintiff T.R.), and was not anonymized or redacted.

244. Defendant intercepted and/or facilitated these interceptions without Plaintiff T.R.'s knowledge, consent, or express written authorization.

245. As a patient, Plaintiff T.R. reasonably expected that her online communications with Defendant via the Website were solely between herself and Defendant and that Defendant would not transmit her Private Information to Google for marketing purposes.

246. But for her status as Defendant's patient, Plaintiff T.R. would not have disclosed her Private Information to Defendant or used its Website.

247. When Plaintiff T.R. used the Website, her IP address, device IDs, and other personal identifiers were sent to Google alongside the substance of her communications.

248. The presence of advertisements confirms Defendant's unlawful transmission of Plaintiff T.R.'s Private Information to third parties.

249. In sum, Defendant's Tracking Tools transmitted Plaintiff T.R.'s highly sensitive communications and Private Information to Google, including communications that contained private and confidential information, without Plaintiff T.R.'s knowledge, consent, or express written authorization.

250. By doing so without Plaintiff T.R.'s consent, Defendant breached Plaintiff T.R.'s and Class Members' right to privacy and unlawfully disclosed Plaintiff T.R.'s Private Information.

251. Upon information and belief, as a "redundant" measure to ensure Plaintiff T.R.'s and Class Members' Private Information was successfully transmitted to third parties like Google, Defendant implemented server-based workarounds, such as server-side tagging, to send Plaintiff T.R.'s and Class Members' Private Information from electronic storage on Defendant's server directly to Google.

252. Plaintiff T.R. suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff

T.R.'s medical conditions and other confidential information she communicated to Defendant via the Website.

253. Plaintiff T.R. has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

***Plaintiff P.S.'s Experience***

254. Plaintiff P.S. is a patient of Defendant and last used the Website in October 2026. She first used the Website approximately three years ago.

255. Plaintiff P.S. used the Website for the purpose of scheduling and checking appointments, communicating with her doctors, filling out forms, viewing test results, requesting information, making payments, and viewing services such as looking up particular doctors.

256. Plaintiff P.S. recalls entering personal and health-related information into the Website.

257. During all relevant times, Plaintiff P.S. has also had a Google account which she was logged into while using the Google Chrome browser on her personal computer and mobile device, and believes that the Private Information she communicated via the Website was also transmitted to Google via Defendant's use of Google Analytics on the Website. Plaintiff P.S. used those same devices to access Defendant's Website.

258. Plaintiff P.S. has proof showing that she used the Website. She recalls seeing a cookie, privacy, or consent pop-up when using the Website and did not accept it. Upon information and belief, Defendant's Tracking Tools nonetheless continued to collect and transmit her Private Information to Google. After viewing the Website, she noticed advertisements about the company or related services on social media and other websites and applications consistent with the use of her Website activity for targeted marketing.

259. Upon information and belief, the Private Information that Google received from Defendant included specific facts concerning her medical condition and treatments, was personally identifiable (linked to Plaintiff P.S.), and was not anonymized or redacted.

260. Defendant intercepted and/or facilitated these interceptions without Plaintiff P.S.'s knowledge, consent, or express written authorization.

261. As a patient, Plaintiff P.S. reasonably expected that her online communications with Defendant via the Website were solely between herself and Defendant and that Defendant would not transmit her Private Information to Google for marketing purposes.

262. But for her status as Defendant's patient, Plaintiff P.S. would not have disclosed her Private Information to Defendant or used its Website.

263. When Plaintiff P.S. used the Website, her IP address, device IDs and other personal identifiers were sent to Google alongside the substance of her communications.

264. The presence of advertisements confirms Defendant's unlawful transmission of Plaintiff P.S.'s Private Information to third parties.

265. In sum, Defendant's Tracking Tools transmitted Plaintiff P.S.'s highly sensitive communications and Private Information to Google, including communications that contained private and confidential information, without Plaintiff P.S.'s knowledge, consent, or express written authorization.

266. By doing so without Plaintiff P.S.'s consent, Defendant breached Plaintiff P.S.'s and Class Members' right to privacy and unlawfully disclosed Plaintiff P.S.'s Private Information.

267. Upon information and belief, as a "redundant" measure to ensure Plaintiff P.S.'s and Class Members' Private Information was successfully transmitted to third parties like Google, Defendant implemented server-based workarounds, such as server-side tagging, to send Plaintiff P.S.'s and Class Members' Private Information from electronic storage on Defendant's server directly to Google.

268. Plaintiff P.S. suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the

continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff P.S.'s medical conditions and other confidential information she communicated to Defendant via the Website.

269. Plaintiff P.S. has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

**M. Class Wide Injuries, Damages, and Remedies**

270. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including breach of fiduciary duty/confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

271. Consequently, Plaintiffs individually and on behalf of the putative Class, bring this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiffs and the putative Class have suffered significant damages and seek the following remedies:

a. Compensatory damages;

b. Loss of benefit of the bargain;

c. Conversion (FMV value of the use of the data for marketing);

d. Statutory damages;

e. Nominal damages, in the alternative;

f. Consequential and future damages for reasonable and necessary data monitoring services including data broker and dark web monitoring, as well as the cost of removing the disclosed data and profiles from data broker networks;

g. Restitution for the FMV of the misuse of the Private Information;

h. Disgorgement of profits or cost savings derived from misuse of Plaintiffs' and Class Members' Private Information;

i. Injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

272. The injunctive relief sought includes:

a. Removal of the Tracking Tools from sensitive parts of the Website;

b. Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

c. Deletion of all audience profiles and campaigns built from data gathered through the Tracking Tools and from Plaintiffs' and Class Members' Private Information;

d. Deletion of Plaintiffs' and Class Member data from all identifiable third-party broker lists;

e. Enjoining Defendant from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

f. Enjoining Defendant from utilizing any other Tracking Tools or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with third parties.

g. Other relief as ordered by the Court.

## TOLLING

273. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their PII and PHI was intercepted and unlawfully disclosed to Google because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

274. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

275. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Tracking Tools on Defendant's Website.

276. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

277. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

278. <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI have been improperly disclosed to Google, and the Class is identifiable within Defendant's records.

279. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to inform Plaintiffs and Class Members that their Private Information had been divulged;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by divulging the Private Information of Plaintiffs and Class Members without their consent;

g. Whether Defendant violated the consumer protection statutes asserted as claims in this Complaint;

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

280. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information divulged as a result of Defendant's incorporation of Tracking Tools, due to Defendant's misfeasance.

281. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

282. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class

Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

283. Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

284. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be

recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

285. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

286. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

287. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

288. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

289. Issue Certification. Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;
b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;
c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;
d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;
e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

290. Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

## COUNT I
## BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
## (On Behalf of Plaintiffs and the Class)

291. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

292. Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

293. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

294. In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became a guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients,

including Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to inform Plaintiffs and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

295. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

296. These disclosures were made for commercial purposes without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

297. The unauthorized disclosures of Plaintiffs' and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiffs' and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under those policies and procedures.

298. The third-party recipients included, but may not be limited to, Google. Such information was received by these third parties in a manner that allowed them to identify the Plaintiffs and the individual Class Members.

299. Defendant's breach of the common law implied covenant of trust and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

a. By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiffs' and Class Members PHI;

e. By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to

those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g. By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

h. By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

i. By failing to keep Private Information confidential as required by O.C.G.A. § 31-33-1; and

j. By otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

300. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of

the essential confidential relationship between the healthcare provider and the patient.

301. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Private Information.

**<u>COUNT II</u>**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq.***
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiffs and the Class)**

302. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

303. The ECPA protects both sending and receipt of communications.

304. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

305. The transmissions of Plaintiffs' Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

306. The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

307. **Electronic Communications.** The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

308. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

309. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

310. **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to

intercept a[n] … electronic communication[.]” 18 U.S.C. § 2510(5). The following constitute “devices” within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs’ and Class Members’ browsers;

b. Plaintiffs’ and Class Members’ computing devices;

c. Defendant’s web-servers; and

d. The tracking tool deployed by Defendant to effectuate the sending and acquisition of patient communications

311. Whenever Plaintiffs and Class Members interacted with Defendant’s Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs’ and Class Members’ electronic communications to Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

312. Whenever Plaintiffs and Class Members interacted with Defendant’s Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs’ and Class Members’ electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without

authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

313. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools it embedded and operated on its Website, contemporaneously and intentionally redirected the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

314. Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs and Class Members regarding PII and PHI, treatment, medication, and scheduling.

315. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

316. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of

an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

317. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

318. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

319. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Tracking Tools.

320. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

321. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

322. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

323. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

324. Defendant's acquisition of patient communications that were used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Georgia, including:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Criminal and civil violations of O.C.G.A. § 16-11-62, Eavesdropping, Surveillance, or Intercepting Communication Which Invades Privacy of Another; Divulging Private Message;

c. Criminal and civil violations of O.C.G.A. § 16-9-93(c), Forgery and Fraudulent Practices; Computer Systems Protection; Computer Crimes;

d. Violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370, *et seq.*; and

e. Invasion of Privacy.

325. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

326. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

327. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed individually identifiable health information to Google without patient authorization as expressly required in its false and misleading privacy policies.

328. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Google Tracking Tools was for Defendant's commercial advantage to increase revenue.

329. Under O.C.G.A § 16-11-62, it shall be unlawful for "Any person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view; provided, however, that it shall not be unlawful". A Device under this statute is defined as, "an instrument or apparatus used for overhearing, recording, intercepting, or transmitting sounds or for observing, photographing, videotaping, recording, or transmitting visual images and which involves in its operation electricity, electronics, or infrared, laser, or similar beams. Without limiting the

generality of the foregoing, the term "device" shall specifically include any camera, photographic equipment, video equipment, or other similar equipment or any electronic, mechanical, or other apparatus which can be used to intercept a wire, oral, or electronic communication.”

330. Defendant violated O.C.G.A § 16-11-62 by exceeding its authorization to access Plaintiffs’ and Class Members’ computers through use of a Device, namely, placement of the _ga, NID, and CID cookies as well as use of source code that commanded Plaintiffs’ and Class Members’ computing devices to make unauthorized copies of Plaintiffs’ and Class Members’ electronic data and to send identifiers and the content of communications with Defendant simultaneously to Defendant, Google, and others.

331. Under O.C.G.A § 16-9-93(c), a person commits the offense of computer invasion of privacy when, “Any person who uses a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination is without authority shall be guilty of the crime of computer invasion of privacy.”

332. Defendant violated O.C.G.A. § 16-9-93(c) when it knowingly and without Plaintiffs or Class Members’ authorization inserted the _ga, NID, and CID cookies on Plaintiffs’ and Class Members’ computing devices.

333. The _ga, NID, and CID cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google and others.

334. Defendant knew or had reason to know that the _ga, NID, and CID cookies would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google and others.

335. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy amounting to an invasion of privacy because Defendant facilitated Google's simultaneous eavesdropping and wiretapping of confidential communications.

336. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their individually-identifiable patient health information on its Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' individually-identifiable patient health information with Google, third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving

their individually-identifiable patient health information, and that Plaintiffs and Class Members did not consent to receive this information.

337. Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

338. As such, Defendant cannot viably claim any exception to ECPA liability.

339. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiffs or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' individually-identifiable patient health information, such as understanding how people use its Website and determining what ads people see on its Website, without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

340. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT III
## VIOLATION OF O.C.G.A § 16-11-62
## EAVESDROPPING, SURVEILLANCE, OR INTERCEPTING COMMUNICATION WHICH INVADES PRIVACY OF ANOTHER; DIVULGING PRIVATE MESSAGE
**(On Behalf of Plaintiffs and the Class)**

341. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

342. Plaintiffs and Class Members have a statutory right to keep any private communications kept private and to not be divulged to an unauthorized person under Georgia law.

343. Defendant intentionally and without Plaintiffs' or Class Members' consent intercepted private communications between them and their healthcare providers then divulged that information to Google, and others through the cookies embedded within Defendant's website.

344. Defendant's use of Plaintiffs' and Class Members' names and Private Information did not serve any public interest.

345. The unlawful tracking of Plaintiffs and Class Members' and disclosure of their Private communications has caused Plaintiffs and Class Members to suffer damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiffs and Class Members have also suffered nominal damages.

346. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted intentionally when it installed the tracking tools onto its Website because the purpose of the tools is to track and disseminate individuals' communications with the Website for the purpose of marketing and advertising.

347. Because Defendant intentionally and secretly incorporated the Google tracking tools into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

348. Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiffs and Class Members are entitled to nominal damages.

349. Plaintiffs and Class Members are entitled to exemplary and/or punitive damages as a result of Defendant's knowing violations of their statutory rights to privacy.

350. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of Google, and the wrongful disclosure of the information cannot be undone.

351. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Google, who continues to possess and utilize that information.

352. Plaintiffs, on behalf of themselves and Class Members, further seek injunctive relief to enjoin Defendant from further intruding into Plaintiffs' and Class Members' statutory privacy interests.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiffs and the Class)

353. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

354. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Private Information and compensation for their medical care.

355. When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

356. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

357. Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

358. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information without consent to third parties like Google.

359. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

360. Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class)**

361. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class. Count V is pleaded in the alternative to Count IV for breach of implied contract.

362. Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

363. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization as required in its privacy policies and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

364. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

365. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

366. The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly

derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

367. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VI
## NEGLIGENCE
## (On behalf of Plaintiffs and the Class)

368. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

369. Defendant owed Plaintiffs and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

370. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

371. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

372. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

373. The third-party recipients included, but may not be limited to, Google and its subsidiaries.

374. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Private Information.

**<u>COUNT VII</u>**
**VIOLATIONS OF O.C.G.A. §§ 10-1-370, *et seq.***
**THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(On behalf of Plaintiffs and the Class)**

375. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

376. This cause of action is brought pursuant to the Georgia UDTPA, O.C.G.A. §§ 10-1-370, *et seq.*, which Georgia courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

377. Georgia UDTPA § 10-1-372 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Georgia.

378. By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of Georgia UDTPA § 10-1-372. The conduct alleged herein is a "business practice" within the meaning of Georgia UDTPA § 10-1-372, and the deception occurred within the State of Georgia.

379. By serving as Plaintiffs' and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

380. Plaintiffs and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

381. Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment to Plaintiffs and Class Members.

382. Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the state of Georgia and the United States.

383. The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding Google's tracking tools, emanated and arose within the state of Georgia, within the scope of Georgia UDTPA §10-1-372.

384. Defendant, operating in and out of Georgia, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of UDTPA §10-1-372, including but not limited to the following: (a) knowingly promising to protect Plaintiffs' and Class Members' Private Information in its privacy policies, (b) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiffs' and Class Members' Private Information; and (c) knowingly disclosing Plaintiffs' and Class Members' Private Information to Google.

385. Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiffs' and Class Members' Private Information unless under a legal obligation to do so.

386. These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including but not limited to HIPAA, Georgia computer crime statutes, and Georgia UDTPA § 10-1-372.

387. Defendant knew or should have known that its Website and the cookies and source code thereon was unlawfully wiretapping, intercepting, and disclosing Plaintiffs' and Class Members' Private Information.

388. Plaintiffs have standing to pursue this claim because as a direct and proximate result of Defendant's violations of Georgia UDTPA § 10-1-372, Plaintiffs and Class Members have been "aggrieved" by a violation of Georgia UDTPA § 10-

1-372 and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate Georgia UDTPA § 10-1-372.

389. Plaintiffs also have standing to pursue this claim because, as a direct result of Defendant's knowing violation of Georgia UDTPA § 10-1-372, Plaintiffs and Class Members have lost money or property in the form of monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

390. Plaintiffs and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiffs' and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner; (d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Website; (f) ordering

Defendant to meaningfully educate individuals about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

391. Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

392. The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

393. Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

394. Plaintiffs and Class Members seek relief under Georgia UDTPA § 10-1-372, including, but not limited to, a declaratory judgment that Defendant's actions

and/or practices violate Georgia UDTPA § 10-1-372; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate Georgia UDTPA § 10-1-372 as described above.

395. Plaintiffs and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

**COUNT VIII**
**VIOLATION OF O.C.G.A § 16-9-93(c)**
**FORGERY AND FRAUDULENT PRACTICES; COMPUTER SYSTEMS PROTECTION; COMPUTER CRIMES**
**(On behalf of Plaintiffs and the Class)**

396. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

397. Under O.C.G.A § 16-9-93(c), any person who uses a computer or computer network with the intention of examining any medical or personal data relating to any other person with knowledge that such examination is without authority is guilty of the crime of computer invasion of privacy.

398. Defendant through use and implementation of the _ga, NID, and CID cookies on its website intentionally examined Plaintiffs and Class Members' medical and Private Information without Plaintiffs or Class Members' authority.

399. O.C.G.A § 16-9-93(g) authorizes civil relief, including "any damages sustained and the costs of suit," for any person whose property or person is injured

by reason of a violation of O.C.G.A § 16-9-93. Authorized civil relief includes lost profits and victim expenditure.

400. Accordingly, Plaintiffs and Class Members are entitled to relief.

**COUNT IX**
**INVASION OF PRIVACY (INTRUSION UPON SECLUSION)**
**(On behalf of Plaintiffs and the Class)**

401. Plaintiffs incorporate paragraphs 1-290 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

402. The Private Information of Plaintiffs and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

403. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

404. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

405. Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Private Information to Google is highly offensive to a reasonable person.

406. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or

as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

407. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Google's simultaneous eavesdropping and wiretapping of confidential communications.

408. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Tracking Tools onto its Website because the purpose of the Tracking Tools is to track and disseminate individuals' communications with the Website for the purpose of marketing and advertising.

409. Because Defendant intentionally and willfully incorporated the Tracking Tools into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

410. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and Class Members were disclosed to a third party without authorization, causing Plaintiffs and Class Members to suffer damages.

411. Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the

value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

412. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members since their Private Information is still maintained by Defendant and still in the possession of Google and the wrongful disclosure of the information cannot be undone.

413. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Google, which upon information and belief, continues to possess and utilize that information.

414. Plaintiffs and Class Members further seek injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B. For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C. For equitable relief in the form of restitution and disgorgement of profits;

D. For injunctive relief requested by Plaintiffs, including, but not limited to:

i. Removal of the Tracking Tools from sensitive parts of the Website;

ii. Deletion of all analytics data collected through the Tracking Tools;

iii. Deletion of all audience profiles and campaigns built utilizing data gathered from the Tracking Tools;

iv. Deletion of Plaintiffs' and Class Member data from all identifiable third-party broker lists;

v. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

vi. Enjoinment from utilizing any other Tracking Tools or marketing services without first obtaining HIPAA

compliance patient consent and BAA agreements with the third parties.

vii. Other injunctive relief as ordered by the Court.

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: November 3, 2026

Respectfully submitted,

**MILBERG PLLC**

*/s/ Casondra Turner*
Casondra Turner, Esq. (GA Bar No. 418426)
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
Tel: (771) 772-3086
E: cturner@milberg.com

Alexandra Mormile*
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
T: 305-479-2299
amormile@shamisgentile.com
**pro hac vice forthcoming*

***Counsel for Plaintiffs and the Putative Class***